Joseph SUDUL, Plaintiff,

v.

COMPUTER OUTSOURCING SERVICES, INC., a New York Corporation; Datafast, Inc., a New York Corporation; Zachary Lonstein, also known as Zach Lonstein and James E. Dellarmi, Defendants.

No. 94 Civ. 1518 (JGK).

United States District Court, S.D. New York.

March 10, 1996.

---

David M. Hoffman, Springfield, NJ, for plaintiff.

Arthur F. Abelman, Joel Sharrow, Moses & Singer, New York City, for defendants.

## OPINION

KOELTL, District Judge:

The plaintiff Joseph Sudul ("Sudul") has sued the defendant Computer Outsourcing Services, Inc. ("COSI") for alleged breach of an employment agreement. COSI maintains that it had "just cause" under the terms of the agreement to terminate Sudul and that it did so in good faith as determined by its Board of Directors. This case was tried to the Court without a jury. At the conclusion of the trial, the defendant moved to amend its answer pursuant to Fed.R.Civ.P. 15(b) to add a defense of fraudulent inducement, which it contends was supported by the evidence and tried by the express or implied consent of the parties.

As discussed below, the defendant's motion is denied because the defense was not implicitly or expressly tried, and the plaintiff would be prejudiced by adding such a defense after the trial has concluded. Even if the amendment were allowed, the defense would fail in any event because the evidence admitted at the trial does not support it. Accordingly, for the reasons explained below, the Court denies the defendant's motion to amend the answer and, in the alternative, dismisses the defendant's defense of fraudulent inducement.

The Court enters the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ. 52(a).

*Findings of Fact*

1. Joseph Sudul is a citizen of the State of Connecticut.

2. Sudul is a professional computer operator, programmer, and manager. He was an employee, shareholder, officer, and director of Datafast, Inc. ("DFI"), and was employed by DFI for about 25 years prior to December 4, 1992. He was a close working associate of James Dellarmi, the President and principal shareholder of DFI.

3. DFI is a computer service company that provides accounts receivable and batch data processing services. (Pl.'s Exh. 4(c) (Draft Processing Agreement).)

4. James Dellarmi performed most of DFI's sales and marketing functions, and Sudul managed the data processing functions of DFI. (Undisputed Fact ("UF") 4(c).)

5. Defendant Computer Outsourcing Services, Inc. ("COSI") is a New York Corporation with its principal place of business in New York, New York.

6. COSI provides comprehensive data processing services to commercial customers principally in the New York metropolitan area. The Company's services can provide all or a portion of a client's internal data processing functions and are known as "outsourcing". (Pl.'s Exh. 1 (COSI Prospectus).)

7. Zach Lonstein is and was at all times relevant to this case the President and Chairman of the Board of COSI as well as a principal shareholder of COSI.

8. In the summer of 1992, Dellarmi unsuccessfully attempted to negotiate a sale of DFI or its business to COSI.

9. With Mr. Sudul's assistance, Mr. Dellarmi thereafter negotiated a written agreement with COSI on behalf of DFI (the "Processing Agreement"). Under this contract, dated December 4, 1992, DFI subcontracted its data processing requirements to COSI. COSI agreed to perform for a four-year period all the data processing services DFI offered to its clients at the time of the Agreement. In addition, COSI had the right of first refusal to perform any new types of services DFI might offer in the future. (Joint Exh. A. ¶ 11.) DFI agreed to relocate its data processing operations from its Westchester, New York office to COSI's office in New York City. Under the contract, DFI would perform its services through a newly created Division at COSI (the "Division" or "DFI Division"). The parties agreed that they would cooperate to convert all of the operating and application software and all of the data files DFI used in its computer service business to run on COSI's IBM mainframe computers and peripheral equipment. COSI and DFI agreed to use their respective best efforts to complete the conversion as soon as reasonably practicable, and in any case before January 30, 1993. (Joint Exh. A ¶ 3.) COSI's obligation to perform services under the Processing Agreement ran for a four-year period beginning the date the conversion would be complete, called the Conversion Date. (Joint Exh. A ¶ 5.) The conversion was concluded on March 8, 1993.

10. Under the Processing Agreement, the newly created Division at COSI performing the services under the Processing Agreement was to hire selected employees of DFI whose services were necessary to the operation of the Division. All such employees were to be "at will" employees except Sudul, who was to be offered a written employment agreement by the DFI Division as its Operations Manager for a term coextensive with the four-year initial term of the Processing Agreement. (Joint Exh. A ¶ 7.)

11. Sudul and COSI entered into an Employment Agreement dated December 4, 1992. (Joint Exh. B.) The term of the Employment Agreement was to commence on the Commencement Date of the Processing Agreement and continue for four years. Accordingly, the Employment Agreement was to be effective for four years beginning March 8, 1993.

12. Under the Employment Agreement, Sudul was to serve as the Vice President and Operations Manager of the DFI Division of COSI, or a similar position. He was to "manage the operations of the Division and report directly to the President of COSI." (Joint Exh. B ¶ 2.) Sudul's consideration was an annual base salary of $69,400, together with certain employee benefits including medical insurance and "a nonaccountable automobile expense allowance of $15,600 per year." (Joint Exh. B ¶ 4.)

13. The Agreement provided that Sudul's employment could be terminated by "COSI with just cause (as determined by COSI's Board of Directors in good faith)...." (Joint Exh. B ¶ 5(a).) This is the only termination provision directly applicable to this litigation.

14. Sudul was essential to the transfer of the DFI operation to another site or computer system. He originally told Lonstein that the conversion could be accomplished by the end of January 1993, but that proved unworkable and was only accomplished later with the assistance of COSI personnel. Sudul was the COSI person responsible for the transfer, which he supervised and played an instrumental role in accomplishing. Although the conversion took somewhat longer than the time provided in the Processing Agreement, Mr. Lonstein testified credibly that the delay from January 31, 1993 to March 8, 1993 was not a cause of Sudul's discharge. Although Lonstein was disappointed and upset because representations he had made to the public about the January conversion date proved to be inaccurate, Sudul was not fired until August. The problems associated with the delay in the conversion did not cause Sudul's termination.

15. After the Processing Agreement and the Employment Agreement with Sudul were signed in December 1992, DFI lost its data processing account for Loehmann's. Loehmann's was a major customer of DFI and a major account for Sudul personally. Sudul had been the account executive on the Loehmann's account and servicing that account had been a significant part of Sudul's responsibilities. Sudul did not, however, deliberately withhold from COSI any information about the Loehmann's account. Sudul testified credibly that he was not aware in December 1992 that DFI was about to lose the Loehmann's account. In addition, the evidence showed that Sudul was not responsible for losing the Loehmann's account and that he could not have reasonably kept the account. Richard Davis, the vice president and controller of Loehmann's, testified credibly that DFI had essentially served as Loehmann's data processing department. When Loehmann's subsequently decided to move various functions in house, Loehmann's sought additional data processing functions from an outside supplier. Davis stated that Loehmann's discussed its needs directly with Dellarmi, but Loehmann's went elsewhere because Dellarmi never met those requirements. Dellarmi wanted to handle the Loehmann's account himself, and in the fall of 1992 he specifically told Davis to deal only with him and not Sudul. Davis testified persuasively and very credibly that he had worked with Sudul for 17 years, that he could not have done his job for Loehmann's without Sudul, that Sudul provided a high level of service and commitment, and that Sudul had nothing to do with the decision to take the Loehmann's account away from DFI.

16. As the conversion took place from December 1992 to March 1993, Sudul worked twelve- to thirteen-hour days and weekends. From March 8, 1993 to June 28, 1993, Sudul continued to work long hours fine-tuning the conversion, which included maintaining the software and programs.

17. DFI, however, did not meet the budget projections of its agreement with COSI. In the Processing Agreement, COSI agreed to loan DFI $200,000 and to share profits with DFI on the DFI business transferred to COSI according to a formula set forth in the Processing Agreement. (Joint Exh. A ¶ 9.) After the Commencement Date, income from the DFI Division was substantially lower than expected, and expenses were higher. COSI's economic benefit from its arrangement with DFI decreased proportionally as expenses rose and revenue declined. Sudul was earning substantially more than any other employee of the DFI Division of COSI, and his salary was a significant expense of the division.

18. The FMS business of DFI consisted of providing data processing services for small businesses. Although Sudul had handled some technical problems in connection with that business prior to the effective date of the Processing Agreement, he had not directly interacted with the customers or dealt with customer complaints. After the Commencement Date Sudul also remained uninvolved in the customer complaint process and left such matters primarily to Phyllis

Williams or to Anne Colavita. Ms. Colavita was a DFI employee who was not scheduled to become a COSI employee.

19. In about March 1993 it became apparent to Lonstein that the DFI Division was not meeting its revenue projections and that its expenses were higher than projected. Although Lonstein had made specific complaints before about the delay of the conversion date, it was only at this time that he began to complain to Dellmari about Sudul's performance in general. At meetings on May 12, June 16, and July 16, 1993, Dellarmi, who was not an employee or agent of COSI, told Sudul that COSI was dissatisfied with his performance.

20. Faced with the poor performance of the DFI Division of COSI and the substantial salary that Sudul was earning compared to other employees, Lonstein eventually asked Sudul to accept a reduction of his salary from $69,400 to $45,000 per year, which was similar to the salary that Sudul had been earning at DFI before he was employed by COSI. When Lonstein made this request, he did not threaten Sudul with discharge and gave Sudul time to consider whether to accept the salary reduction. Sudul took three days to consider it, talked to his wife about it, and agreed to accept it. Sudul voluntarily accepted the salary reduction and was not forced or threatened to do so.

21. On June 25, 1993, COSI and Sudul effected the reduction in salary by signing a simple two sentence Amendment to the Employment Agreement:

### EMPLOYMENT AGREEMENT

Amendment to the Employment Agreement dated December 4, 1992 between Computer Outsourcing Services, Inc. and Mr. Joseph Sudul.

Effective Monday, June 28, 1993, I have agreed that my annual base salary as stated in Section 3 of the original Employment Agreement shall be changed to $45,000 per year.

(Joint Exh. C.) Mr. Sudul read the Amendment prior to signing it and did not claim that it was ambiguous or that he did not understand it. Indeed, he testified at trial that he understood the Amendment, that it accurately reflected the agreed-to salary reduction, and that he voluntarily signed it. At no time prior to the trial of this action did Sudul complain that economic duress compelled him to sign the Amendment.

22. COSI discharged Sudul on or about August 23, 1993, effective as of the week ending August 20, 1993. COSI had paid Sudul a total of $28,277.00 in salary. (UF ¶ 4.F.)

23. Lonstein discharged Sudul after discussing the decision and receiving concurrence from members of the COSI Board of Directors. Lonstein submitted to the Board a Memorandum dated August 10, 1993 (incorrectly marked as June 7, 1994), (Joint Exh. D), which listed four reasons for discharging Sudul for "just cause." Although the memo purports to be "merely representative of Sudul's unsatisfactory performance of his duties as Vice President and Operations Manager of the Division," no other support is provided in the Memo other than the four examples. Had there been any other substantial example of "just cause" it would surely have been listed, given the lack of substance for the reasons actually provided. The reasons provided are pretextual excuses for firing a highly paid employee who had already served his function by overseeing the integration of DFI's functions and customer base into COSI's operation, and whose services were no longer needed because other technical people at COSI and other more modestly paid former employees of DFI could perform them. The fact that Sudul's job could be performed more cheaply by others, however, does not constitute good cause for discharging him in violation of his contract. Sudul was fired to save money rather than because of any of the reasons offered in the memo.

24. The evidence does not support the individual reasons given for Sudul's discharge. For example, although Lonstein charged in Reason 1 that Sudul lacked the competence and ability to perform his duties, Sudul had successfully worked at DFI for twenty-five years and was the second most senior executive. He had successfully satisfied Loehmann's with his abilities for 17

years, and although there were complaints about the conversions of DFI's operations to COSI he was responsible for overseeing that transition. Reason 2 charged that Sudul could have kept the Loehmann's account "had he performed his job competently," but the only testimony by a Loehmann's executive was to the contrary. There is no credible evidence that Sudul was responsible for losing that account or that he could have kept it. Although Reason 3 accused Sudul of lack of knowledge and experience in dealing with FMS customers, that was not an area he had traditionally handled at DFI, and the criticism of Sudul's performance came from witnesses who had an interest in belittling Sudul's role and in supporting the proposition that he was not needed at COSI. Neither Sudul's unresponsiveness to one customer, which is the only specific example given in Reason 3, nor his failure to complete an analysis of messenger requirements, the basis for alleged Reason 4, would constitute good cause for discharge, and when viewed in the context of what Sudul did, are best described as trivial.

25. It is apparent that in the summer and even fall of 1993 there was an effort to develop a "paper trail" to justify Sudul's termination. For example, on August 10, 1993 Lonstein called Dellarmi, told him that COSI did not need Sudul, elicited the fact that DFI was dissatisfied with Sudul, and asked Dellarmi to put that dissatisfaction in writing. Dellarmi responded with a letter dated August 10, 1993. The letter is at best disingenuous. The letter states that "[a]t the time of our initial contract negotiations, it was my opinion that Mr. Sudul was required to successfully move our computer systems and account base to your location. Specifically, I was constantly assured by Mr. Sudul that in his capacity as Executive Vice President, he possessed the knowledge and experience to manage all aspects of our service operations and particularly the ongoing requirements of our largest account, Loehmann's Inc." The letter is misleading given that Dellarmi was the one who was handling the Loehmann's problem and disingenuous in its discussion of Sudul's role at DFI. Dellarmi and Sudul had worked together for about 24 years at DFI, a very small computer operation, and Dellarmi testified at trial that he had found Sudul technically knowledgeable. It is incredible that Dellarmi would need to rely on Sudul's explanation of what he did at DFI. There was no prior letter from Dellarmi to Lonstein complaining about Sudul. Dellarmi's letter appears to be an effort to create a written record of poor performance that did not exist before and was not justified by the facts.

26. In short, based upon my assessment of the credibility of the witnesses, it is apparent that the proffered reasons for Sudul's discharge were pretextual and that Sudul was discharged not because of incompetence but rather to reduce costs. After discharging Sudul, COSI went about developing and attempting to document the reasons for his discharge; however, these reasons simply served to cover up that Sudul was discharged simply to save money.

27. Sudul made no effort to obtain another job for six months after discharge. Sudul claimed emotional distress prevented his job search; however, Sudul presented no evidence of any mental or physical incapacity or limitation. He registered for unemployment insurance and received a total of $7,800 as unemployment insurance. After six months of unemployment, Sudul went to an employment agency, went on a job interview, visited a job fair, had a telephone interview, read newspaper advertisements, and began to look at taking a job in other fields such as retail sales.

28. COSI presented evidence that the mainframe computer data industry is thriving, that many large companies use mainframe computers, and that Computer Associates, which manufactures software for users of mainframe computers like COSI is doing quite well.

29. COSI is advertising for a programmer for a mainframe computer and offering to pay $50,000 to $70,000 per year. This salary range is competitive to what other companies similar to COSI are paying. COSI would not, however, rehire Sudul.

30. Sudul has not attempted to seek a job from any of his prior contacts such as those at Loehmann's.

31. When he was employed at COSI, Sudul rejected medical coverage under COSI's plan and elected coverage under his wife's plan, which he continues to have. Sudul made no showing that he currently pays any money for his medical coverage or that such coverage has changed, is less than that which COSI had offered to him under the Employment Agreement in 1993, or is less than that which COSI is currently offering to its officers.

32. Sudul received an automobile allowance of $15,600 but was not required to use the automobile as part of his job. Sudul declared the automobile allowance he received at COSI as income rather than as expense reimbursement on his income tax return and COSI reported it to the Internal Revenue Service as compensation to Sudul. Sudul was not required to account in any way for the use of the automobile allowance.

### Conclusion of Law

1. This Court has jurisdiction over this action based on diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332.

2. At the close of all the evidence, COSI orally moved pursuant to F.R.Civ.P. 15(b) to amend its pleadings to include an affirmative defense of fraud. COSI contends that the Employment Agreement is void because it was fraudulently induced by the plaintiff's factual misrepresentations and misleading concealment of matters such as the state of DFI's relationship with Loehmann's and DFI's financial condition. The issue of fraudulent inducement was not included in either the pleadings or the final pretrial order issued pursuant to F.R.Civ.P. 16(e).

3. The motion to amend is denied. F.R.Civ.P. 15(b) provides that pleadings shall be deemed to be amended to conform to the proof where the issue has been tried by the express or implied consent of the parties.[1] *United States v. Certain Real Property and Premises, Known as 890 Noyac Road, Noyac, N.Y.*, 945 F.2d 1252, 1257 (2d Cir.1991). To determine whether the amendments to the pleadings should be allowed, the relevant inquiry is

> whether the new issues were tried by the parties' express or implied consent and whether the [nonmoving party] would be prejudiced by the implied amendment, i.e., whether he had a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retried on a different theory.

*Id.* at 1257 (internal quotations omitted). If the plaintiff implicitly or expressly consented to the trial of the defendant's affirmative defense, the Court must grant the defendant's motion to amend. If this is not the case, it is within the Court's discretion to permit amendment so long as the plaintiff would not thereby be prejudiced, and "should be granted in the absence of such prejudice if the interests of justice so require." *Hillburn by Hillburn v. Maher*, 795 F.2d 252, 264 (2d Cir.1986), *cert. denied sub. nom. Heintz v. Hillburn*, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 859 (1987).

4. The first inquiry is whether the plaintiff implicitly or expressly consented to the trial of the defendant's affirmative defense. "Whether a party has 'implicitly consented' to the trial of an issue not presented by the pleadings depends on whether [the party] recognized that the issue had entered the case at trial.'" *Certain Real Property*, 945 F.2d at 1257 (quoting 6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 1493, at

---

1. Rule 15(b) provides in relevant part as follows: When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

462 (1971)). COSI's counsel argues that the plaintiff knew that the affirmative defense of fraudulent inducement was an issue at trial because COSI's counsel stated in his opening that Sudul had "snookered" COSI. That remark does not, however, establish that the plaintiff implicitly consented to the defendant's affirmative defense. When read in context, the statement appears to have been directed particularly to Sudul's alleged representation about the date that the conversion of DFI's operations to COSI could be completed. It does not appear to refer to the laundry list of fraudulent misrepresentations and concealments COSI now alleges Sudul made. In any event, this statement certainly did not particularize the misrepresentations and concealments the defendant now alleges. His comment was hardly notice of the existence of an affirmative defense based on fraud.

■ 5. COSI also alleges that the plaintiff implicitly consented to a fraudulent inducement defense because COSI was able to elicit evidence of fraud without objection, such as evidence that Sudul had knowledge of the state of DFI's relationship with Loehmann's and of his relative importance to DFI. All of this evidence, however, was directly relevant to other issues in the case, such as whether there was "just cause" to discharge Sudul. The fact that evidence "relevant to both pled and unpled issues[ ] was introduced without objection does not imply consent at trial of the unpled issues, absent some obvious attempt to raise them." *Luria Bros. & Co., Inc. v. Alliance Assurance Co., Ltd.,* 780 F.2d 1082, 1089 (2d Cir. 1986); *see also Certain Real Property,* 945 F.2d at 1258 (holding that failure to object to evidence relevant to two other issues insufficient to imply consent to litigate on different issue); *Doubleday & Co., Inc. v. Curtis,* 763 F.2d 495, 503 (2d Cir.), *cert. dismissed,* 474 U.S. 912, 106 S.Ct. 282, 88 L.Ed.2d 247 (1985) (same). The defendant made no obvious attempt to raise the affirmative defense of fraudulent inducement in the pleadings, the joint pretrial order, any statements during the trial, or any rulings at trial. Accordingly, the defendant has failed to show that it is entitled to a mandatory amendment of the pleadings.

6. The second inquiry under Rule 15(b) is whether amending the answer would prejudice the nonmoving party. *Fisher v. Vassar College,* 70 F.3d 1420, 1449 (2d Cir.1995), *reh'g pending; Certain Real Property,* 945 F.2d at 1259. "Substantial prejudice may exist where it is not clear that the opposing party had the opportunity to defend against the new claim and where that party might have offered additional evidence had it known of the claim." *Grand Light & Supply Co., Inc. v. Honeywell, Inc.,* 771 F.2d 672, 680 (2d Cir.1985). The question of whether a party had an opportunity to contest an issue "overlaps substantially with the question of implied consent." *Certain Real Property,* 945 F.2d at 1259.

7. Here, granting the defendant's motion to amend the answer would prejudice the plaintiff. Sudul's attorney persuasively argues that if he had understood that there was a defense of fraudulent inducement he would have conducted various examinations differently and adduced additional evidence, particularly with respect to the state of mind of the various participants in the alleged fraud. *See Grand Light & Supply Co.,* 771 F.2d at 680 (noting that "[s]ubstantial prejudice may exist where it is not clear that the opposing party had the opportunity to defend against the new claim and where that party may have offered additional evidence had it known of the claim"). Because the plaintiff was not aware during the course of the trial that the issue of fraud was being tried, the plaintiff had no opportunity to present contrary evidence. *See Certain Real Property,* 945 F.2d at 1259 (finding that opposing party had no opportunity to present evidence on issue because party had not been aware that that issue was being litigated).

8. In addition, the interests of justice do not support granting the defendant's motion to amend under the circumstances of this case. COSI has offered no explanation for delaying its motion to amend until the case was submitted to the Court for decision at the end of trial. If counsel for COSI believed that his comment about "snookering" was sufficient to put Sudul on notice that the defendant was alleging fraudulent induce-

ment, he should have sought to amend the pleadings at that time to make it clear that the defendant was in fact asserting that defense. *See Hillburn,* 795 F.2d at 264 (finding that denial of motion to amend in the interests of justice was not abuse of discretion given moving party's long unexplained delay in making the motion to amend).

9. Even if the Court permitted the defendant to amend the pleadings to include the defense of fraudulent inducement, the evidence introduced at trial does not support this defense. A claim for fraud under New York common law consists of the following elements: (1) a material false representation or omission of an existing fact; (2) made with knowledge of its falsity; (3) with an intent to defraud; (4) reasonable reliance; (5) that damages the plaintiff. *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 662 N.E.2d 763, 639 N.Y.S.2d 283 (1995); *Graubard Mollen Dannett & Horowitz v. Moskovitz,* 86 N.Y.2d 112, 122, 629 N.Y.S.2d 1009, 1014, 653 N.E.2d 1179, 1184 (1995); *Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995) (applying New York law).[2] The "knowledge" element is satisfied if the representation is made with reckless disregard for its truth. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chipetine,* 634 N.Y.S.2d 469, 470 (1st Dep't 1995); *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 276 (2d Cir.1992) (applying New York law).

10. Fraud can also be effected by concealment even in the absence of a fiduciary relationship where "(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." *Banque Arabe et Internationale D'Investissement,* 57 F.3d at 155 (applying New York law); *see also Remington Rand Corp. v. Amsterdam–*

*Rotterdam Bank, N.V.,* 68 F.3d 1478, 1995 WL 619850, at \*6 (2d Cir.1995) (same); *Young v. Keith,* 112 A.D.2d 625, 626–27, 492 N.Y.S.2d 489, 490–91 (3d Dep't 1985) (citing *Nasaba Corp. v. Harfred Realty Corp.,* 287 N.Y. 290, 295, 39 N.E.2d 243) (1942)).

11. COSI alleges that Sudul deceived it in two ways: first, by misrepresenting his abilities, his managerial role at DFI, and the financial projections of DFI, and by falsely asserting that DFI had all the source codes needed to convert or modify its computerized programs to the COSI operations; and second, by allegedly failing to disclose to COSI (i) that there were problems with the Loehmann's account and that it was likely that the account would not continue and (ii) Anne Colavita's managerial role at DFI.

12. COSI has failed to establish by clear and convincing evidence that the plaintiff fraudulently induced it to enter into the Employment Agreement. *See Banque Arabe,* 57 F.3d at 153 (under New York law, party asserting fraud must prove it by clear and convincing evidence). The defendant has offered no evidence at all that Sudul knowingly or recklessly misrepresented to COSI his abilities, his role at DFI, DFI's source codes, or DFI's financial projections, or concealed information concerning the Loehmann's account or Anne Colavita's role at DFI. As explained above, Sudul was not aware that there was a major problem with the Loehmann's account. Even Dellarmi, who handled the negotiations with Loehmann's, testified that he was surprised when he learned that the account was not continued. The defendant has failed to present clear and convincing evidence that Sudul knew that any financial projections were wrong. Similarly, there is no evidence that Sudul knew that Anne Colavita played an important managerial role at DFI or was essential at COSI. She was not offered a position at COSI and was not hired by COSI after Sudul was fired, facts which cast doubt on the degree to which she was necessary for

---

**2.** In this diversity action, the Court must apply the substantive law, including choice of law rules, of the state in which it sits. *Guaranty Trust Co. of New York v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). All of the relevant activities took place in New York, and there is no dispute that New York law applies inasmuch as the employment contract specifies New York law.

the DFI operations. Accordingly, COSI has failed to prove its fraudulent inducement defense by clear and convincing evidence.

■ 13. The prejudicial effect of allowing an amendment in this case to assert a defense of fraudulent inducement is heightened by the amorphous nature of several of the alleged fraudulent statements and concealments. If the alleged frauds were included in the pleadings, they would have to be alleged with particularity, including the specifics of what was represented and when it was represented. *See* Fed.R.Civ.P. 9(b); *Park & Lexington 25th St. Corp. v. Federal Ins. Co.,* No. 93–6939, 1995 WL 217552, at * 1 (S.D.N.Y. Apr. 13, 1995) (holding that the particularity requirement of 9(b) applies to an affirmative defense of fraud). Here, the allegedly fraudulent statements in the defendant's Purposed Findings of Fact do not even correspond precisely to the description in the defendant's memorandum in support of its motion to amend the answer. In addition, the nature of some of the alleged representations and omissions concerning such matters as the plaintiff's "abilities" and his "alleged managerial role at DFI" are so amorphous that they would not survive a motion under Fed.R.Civ.P. 9(b). Furthermore, these statements appear to nonactionable statements of opinion rather then fact. *See Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) ("[S]tatements will not form the basis of a fraud claim [under New York law] when they are mere 'puffery' or are opinions as to future events"); *Kimmell v. Schaefer,* 637 N.Y.S.2d 147, 149 (1st Dep't 1996) (stating that opinions are not actionable unless they are statements of material fact); *Zanani v. Savad,* 630 N.Y.S.2d 89, 90 (2d Dep't 1995) ("In general, a representation of opinion or a prediction of something which is hoped or expected to occur in the future will not sustain an action for fraud").

■ 14. In its proposed conclusions of law, COSI also seeks to assert a defense of unilateral mistake. Under New York law, a contract may be rescinded on the basis of unilateral mistake when coupled with fraudulent concealment by the knowing party. *Chimart Assocs. v. Paul,* 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 347, 489 N.E.2d 231, 234

(1986); *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). That defense was not contained in the defendant's pleadings as Fed.R.Civ.P. 8(c) requires. The failure to raise an affirmative defense in the answer to the complaint constitutes a waiver of the defense unless the Court grants leave to amend the pleadings pursuant to Fed. R.Civ.P. 15. *See Travellers Int'l, A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1580 (2d Cir.1994) (stating that general rule is that failure to plead an affirmative defense results in waiver; finding that defendant could be deemed to have waived affirmative defense because defendant did not raise it until after the damages trial had begun); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 967 F.2d 742, 751–52 (2d Cir.1992). Here, the defendant failed to plead the affirmative defense of unilateral mistake and did not make a motion to amend the pleadings to include a this defense. Accordingly, the defense is waived.

■ 15. Even if the Court were to reach the merits of the defendant's unilateral mistake defense, the defense would fail. As with the fraudulent concealment defense, the defendant has not presented any evidence that Sudul knew that COSI was under a mistaken belief concerning any material matter relating to his Employment Agreement. *See Winmar Co., Inc. v. Teachers Ins. and Annuity Ass'n of America,* 870 F.Supp. 524, 537 (S.D.N.Y.1994) (citing *Chimart Assocs.,* 66 N.Y.2d at 573–74, 498 N.Y.S.2d at 347, 489 N.E.2d at 233–34) (party claiming unilateral mistake "bears the burden of proving both its own mistake and fraudulent concealment by the other party"); *Investors Ins. Co. of America v. Dorinco Reins. Co.,* 736 F.Supp. 1260, 1264 (S.D.N.Y.), *aff'd on other grounds,* 917 F.2d 100 (1990) (dismissing plaintiff's allegations of unilateral mistake because plaintiff failed to present any specific allegations of fraud).

16. The plaintiff claims that the defendant wrongfully terminated his employment contract by firing him without the "just cause" the contract requires for termination. The Employment Agreement provides that the plaintiff may be terminated for "just cause (as determined by COSI's Board of

Directors in good faith)." The Agreement does not define "just cause."

17. Under New York law, an employer can fire an at-will employee for any reason or no reason at all, as long as the termination is not for a constitutionally impermissible purpose. *Jones v. Dunkirk Radiator Corp.*, 21 F.3d 18, 21–22 (2d Cir.1994) (citing *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987)); *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 305, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983)). In this case, the plaintiff was not an at-will employee but rather an employee under a contract that contained a provision limiting the grounds for his discharge. *See Kemelhor v. Penthouse Int'l, Ltd.*, 689 F.Supp. 205, 213–14 (S.D.N.Y.1988), *aff'd without op.*, 873 F.2d 1435 (2d Cir.1989) (under New York law, employer has the right to discharge employees pursuant to the terms of the employment contract). Under the express terms of the contract, as well as under New York law, the board must determine "just cause" in good faith. *See Kemelhor*, 689 F.Supp. at 213 (under New York law, "an employer seeking to discharge an employee by using a clause in the contract vesting the employer with discretion must act in good faith").

18. Under New York law it is clear that an employee can be dismissed for "just cause" if he breaches his employment contract. *See Ohanian v. Avis Rent A Car System, Inc.*, 779 F.2d 101, 107–08 (2d Cir. 1985) (discussing New York law). The Court of Appeals for the Second Circuit has held that pursuant to New York law "reasons other than an employee's breach" may also constitute "just cause." *Ohanian*, 779 F.2d at 107; *Volmar Distributors, Inc. v. New York Post Co., Inc.*, 825 F.Supp. 1153, 1168 (S.D.N.Y.1993) (Conner, J.).

19. In this case, it is not necessary to explore the outer reaches of the meaning of "just cause" in the Agreement because the defendant did not make a good-faith determination that "just cause" existed to discharge the plaintiff. The defendant claims that Sudul was terminated because of his "unsatisfactory performance of his duties as Vice President and Operations Manager of the Division." (Joint Exh. D.) Although unsatisfactory work performance may have been "just cause" to discharge Sudul, this reason was clearly a pretext for the real reason Sudul was fired, which was simply so that COSI could save money by running the DFI Division without Sudul. Sudul had accomplished the task of integrating DFI's operation into COSI's operation, and he was no longer needed.

20. Based on my evaluation of all the evidence including the credibility of the witnesses, I find that COSI did not did not have just cause as the express terms of the contract required when it discharged Sudul.

21. As a matter of contract interpretation in this Agreement, it is apparent that "just cause" must mean something more than simply a determination that Sudul was no longer needed to run the DFI Division and COSI could save a considerable amount of money by firing him. Otherwise, the term would have no meaning and Sudul would simply be another at-will employee. Sudul was the only former DFI employee hired by COSI who was given the security of an employment agreement. All of the other employees were at-will employees subject to discharge for no reason at all. If "just cause" is to have meaning in Sudul's contract, it must have provided him with more security that simply the determination by COSI that it could save money by having other employees perform Sudul's functions more cheaply. Moreover, under the express terms of the contract and under New York law, the Board of Directors had to determine just cause "in good faith." Based upon all of the evidence and my evaluation of the credibility of the witnesses, I find that the COSI Board of Directors did not make the determination in good faith. It is significant that COSI did not present the testimony of any of its directors except Mr. Lonstein who presented his views to the Board. In any event, as explained above, the memorandum that allegedly contained the reasons presented to the Board for Sudul's discharge contained pretextual rather than the real reasons for Sudul's termination, and the testimony concerning the reasons for the termination was not credible.

22. The plaintiff's measure of damages for the breach of an employment contract is the

> wage that would be payable during the remainder of the term reduced by the income which the discharged employee has earned, will earn, or could with reasonable diligence earn during the unexpired term.

*Donald Rubin, Inc. v. Schwartz*, 191 A.D.2d 171, 171, 594 N.Y.S.2d 193, 194 (1st Dep't 1993) (quoting *Cornell v. T.V. Development Corp.*, 17 N.Y.2d 69, 74, 268 N.Y.S.2d 29, 215 N.E.2d 349 (1966) (internal quotations omitted)); *Jones v. Dunkirk Radiator Corp.*, 21 F.3d 18, 22 (2d Cir.1994) (applying New York law).

23. The parties do not agree which wage should be used to calculate the plaintiff's lost income. The plaintiff argues that because the June 24, 1993 Amendment ("Amendment") to the written Employment Agreement was an accord, he has the right to sue under either the terms of the original agreement or the Amendment. The defendant argues that the plaintiff is entitled only to damages based on the salary contained in the Amendment.

24. Generally, a party signing an agreement is bound by the provisions of such writing. *See Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 11, 537 N.Y.S.2d 787, 792, 534 N.E.2d 824, 829 (1988); *Pimpinello v. Swift & Co., Inc.*, 253 N.Y. 159, 162–163, 170 N.E. 530, 531 (1930); *World Yacht v. Italian Welfare League, Inc.*, 200 A.D.2d 518, 518, 606 N.Y.S.2d 689, 689 (1st Dep't 1994) (citing *Gillman*); *see also Sotheby's, Inc. v. Dumba*, No. 90–6458, 1992 WL 27043, at * 2–3 (S.D.N.Y. Jan. 31, 1992) (New York law). The plaintiff appears to argue that the Amendment is not enforceable for two independent reasons: (1) it was coerced by economic duress or business compulsion, and (2) it is an "accord" without "satisfaction." Both of these arguments are contrary to the evidence at trial and the law in New York and must be rejected.

25. A contract may be voided on the grounds of economic duress only where the complaining party was compelled to agree to the terms by a "wrongful threat by the other party which precluded the exercise of [his] free will," including threats by the other party to breach the contract by withholding performance unless the complaining party agreed to a further demand. *805 Third Ave. Co. v. M.W. Realty Assocs.*, 58 N.Y.2d 447, 451, 461 N.Y.S.2d 778, 780, 448 N.E.2d 445, 447 (1983); *see Graubard Mollen Dannet & Horowitz v. Edelstein*, 173 A.D.2d 230, 230–31, 569 N.Y.S.2d 639, 640 (1st Dep't 1991); *see also Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir.1989) (New York law).

26. Here, the evidence establishes that COSI did not threaten to discharge plaintiff, wrongfully or otherwise, or threaten to cease paying the plaintiff under the original Agreement. The plaintiff testified that he felt threatened because Dellarmi of DFI, a customer of COSI, had warned plaintiff that he might be fired for poor performance. This warning is more fairly characterized as an expression of concern rather than a threat; in any event, there is no basis to impute Mr. Dellarmi's statement to COSI. The plaintiff admitted that he did not know if Lonstein even knew about Dellarmi's statements and admitted that no officer of COSI threatened to fire him in connection with negotiating the reduction of his salary. Instead, the plaintiff testified that he requested several days to think over the proposed salary cut and discuss it with his wife, which he did, whereupon he agreed to the salary cut. He also testified that he voluntarily signed the Amendment only after he read it over and understood its simple and clear terms. Because the plaintiff has not established that the defendant's threats compelled him to execute the Amendment, the plaintiff's claim of duress must fail. *See Graubard*, 173 A.D.2d at 230–31, 569 N.Y.S.2d at 640 (rejecting affirmative defense of duress because party arguing duress failed to present any admissible evidence of a wrongful threat).

27. An additional reason to reject the plaintiff's duress claim is that it was asserted too late. "A party 'who would repudiate a contract procured by duress, must act promptly, or he will be deemed to have elected to affirm it.' " *Bank Leumi Trust Co. of New York v. D'Evori Int'l, Inc.*, 163 A.D.2d 26, 30, 558 N.Y.S.2d 909, 914 (1st Dep't 1990)

(*quoting Bethlehem Steel Corp. v. Solow*, 63 A.D.2d 611, 612, 405 N.Y.S.2d 80, 82 (1st Dep't 1978)); *see also Durante Bros. and Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 251 (2d Cir.1984) (applying New York law), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985). In *Bank Leumi*, for example, the complaining party was deemed to have ratified the allegedly coerced contract where it waited six months to raise the claim of duress. *Bank Leumi*, 163 A.D.2d at 30, 558 N.Y.S.2d at 914; *see also Industrial Recycling Sys., Inc. v. Ahneman Assocs., P.C.*, 892 F.Supp. 547, 551 (S.D.N.Y. 1995) (Parker, J.) (contract not voidable on grounds of duress because complaining party ratified contract through its acquiescence); *Manufacturers Hanover Trust, Co. v. Jayhawk Assocs.*, 766 F.Supp. 124, 128 n. 6 (S.D.N.Y.1991) (Patterson, J.) (noting that under New York law, party who waited a substantial time after entering into a contract to assert claim would be deemed to have affirmed contract even if economic duress were present).

■ 28. Here, the plaintiff did not raise his duress claim promptly. The plaintiff executed the Amendment on June 24, 1993 and worked under it for approximately two months. Although he was discharged in late August 1993, he did not commence this action until March 7, 1994, eight and a half months after the Amendment was executed. Even then, he did not claim duress in his complaint but waited to do so until the trial of this action in August 1995, more than two years after execution of the Amendment. Because the plaintiff waited an inordinate amount of time to challenge the Amendment on the basis of duress, he is deemed to have waived this claim by his acquiescence.

29. The plaintiff also argues that he is entitled to sue on the unamended Employment Agreement because the Amendment was an "accord" without concomitant "satisfaction." This argument is contrary to the evidence and the law.

■ 30. Under New York law, an accord is an agreement by one party to offer and the other to agree to accept in settlement of an existing or matured unpaid claim an amount of money or some performance other than that to which the second party believes it is entitled. *May Dep't Stores Co. v. International Leasing Corp., Inc.*, 1 F.3d 138, 140 (2d Cir.1993); *see Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 383, 604 N.Y.S.2d 900, 905, 624 N.E.2d 995, 1000 (1993) ("An accord is an agreement that a stipulated performance will be accepted, in the future, in lieu of an existing claim."). The execution of the agreement is called satisfaction. "If the satisfaction is not tendered, the obligee may sue under the original claim or for breach of the accord." *Denburg*, 82 N.Y.2d at 383, 604 N.Y.S.2d at 905, 624 N.E.2d at 1000. Here, the plaintiff seeks to sue the defendant for breach of the original Employment Agreement, without any reduction in salary effected by the Amendment.

■ 31. In this case, the Amendment is not an accord but a novation. Because the Amendment is a novation, the plaintiff may not claim damages under the original Employment Agreement. *See Nat'l Am. Corp. v. Federal Republic of Nigeria*, 448 F.Supp. 622, 643 (S.D.N.Y.1978), *aff'd*, 597 F.2d 314 (2d Cir.1979) (stating that if there is a novation, parties may seek relief only under the substitute agreement). The elements of novation are as follows: (1) a previously valid obligation; (2) an agreement of all parties to the extinguishment of the old contract; (3) an agreement of the parties to a new contract; (4) and a valid new contract. *LCA Leasing Corp. v. Borvig Corp.*, 826 F.Supp. 776, 779 (S.D.N.Y.1993) (Sprizzo, J.) (citing *Callanan Indus., Inc. v. Micheli Contracting Corp.*, 124 A.D.2d 960, 961, 508 N.Y.S.2d 711, 712 (3d Dep't 1986)).

■ 32. As some courts have noted, "[i]t is often difficult to distinguish between an executory accord and a substitute agreement," or novation. *Nat'l Am. Corp.*, 448 F.Supp. at 643. The difference rests on a determination of when the parties intended the new agreement to discharge previously existing obligations. *May Dep't Stores Co.*, 1 F.3d at 140; *Denburg*, 82 N.Y.2d at 383–84, 624 N.E.2d at 1000–01, 604 N.Y.S.2d at 904–05. A novation is "an agreement for an existing obligation to be extinguished immediately by the acceptance of a new promise."

*May Dep't Stores Co.*, 1 F.3d at 140 (quoting *National Am. Corp.*, 448 F.Supp. at 643) (internal quotations omitted)). In contrast, if the parties intended that under the new agreement " 'an existing claim [would] be discharged in the future by the rendition of a substituted performance,' " the new agreement constitutes an accord. *Id.* (*National Am. Corp.*, 448 F.Supp. at 643) (internal quotations omitted)).

33. In this case, it is clear from the language of the Amendment that the parties intended the Amendment to discharge the existing obligations of the Employment Agreement and that the Amendment would be substituted as the new agreement for the future. The Amendment states that it is an "[a]mendment to the Employment Agreement" that would be "[e]ffective Monday, June 28, 1993," and that on that date Sudul's "annual base salary as stated in Section 3 of the original Employment Agreement shall be changed to $45,000 per year." (Joint Exh. C.) *See, e.g., Nat'l Am. Corp.*, 448 F.Supp. at 643 (finding that agreement was novation because its language indicated a present discharge of prior obligations). Moreover, based on my evaluation of the witnesses it is also clear that they intended the Amendment to be the new agreement under which they would operate on a going forward basis. Because the Amendment is therefore a novation, the plaintiff may not sue to enforce Section 3 of the original Employment contract. Accordingly, the plaintiff's damages must be based on the salary term contained in the Amendment.

34. As explained above, the general measure of damages for wrongful discharge is " 'the wage that would be payable during the remainder of the term reduced by the income which the discharged employee has earned, will earn, or could with reasonable diligence earn during the unexpired term.' " *Cornell v. T.V. Development Corp.*, 17 N.Y.2d 69, 74, 268 N.Y.S.2d 29, 33, 215 N.E.2d 349, 351 (1966) (quoting *McClelland v. Climax Hosiery Mills*, 252 N.Y. 347, 358, 169 N.E. 605, 609 (1930) (Cardozo, J., concurring), *modified*, 253 N.Y. 533, 171 N.E. 770 (1930)). Here, from August 20, 1993, the effective date of his discharge, until March 7, 1997

(four years after the commencement date of the Agreement), Sudul would have earned $45,000 a year in salary had the defendant not discharged him prematurely.

35. The plaintiff's total wages must be reduced by the amount, if any, that the plaintiff earned or with reasonable diligence could have earned from the date of his discharge to the date the contract terminated. *Cornell*, 17 N.Y.2d at 74, 268 N.Y.S.2d at 33, 215 N.E.2d at 351; *Woodford v. Benedict Community Health Center*, 188 A.D.2d 863, 864, 591 N.Y.S.2d 582, 583 (3d Dep't 1992); *Ronder v. John Waters Assocs., Inc.*, 184 A.D.2d 240, 240, 586 N.Y.S.2d 749, 749 (1st Dep't 1992); *see also Jones v. Dunkirk Radiator Corp.*, 21 F.3d 18, 22 (2d Cir.1994) (applying New York law in wrongful discharge action); *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir.1985) (stating that under New York law plaintiffs have a duty to mitigate their damages). Even though the plaintiff was wrongfully discharged, he was obligated to use reasonable diligence to obtain similar employment elsewhere in the same locality when and if available. *Fuchs v. Koerner*, 107 N.Y. 529, 14 N.E. 445 (1887); *Tynan Incinerator Co. v. International Fidelity Ins. Co.*, 117 A.D.2d 796, 797, 499 N.Y.S.2d 118, 120 (2d Dep't 1986); *AMF, Inc. v. Cattalani*, 77 A.D.2d 779, 780, 430 N.Y.S.2d 731, 733 (4th Dep't 1980) ("[n]o recovery may be had for losses which the person injured might have prevented by reasonable efforts and expenditures"); *see Ingrassia v. Shell Oil Co.*, 394 F.Supp. 875, 885–87 (S.D.N.Y.1975) (explanation of what constitutes substantially similar employment under New York law); *see also* 2 N.Y. PJI 4:21 (1968 & 1996 Supp.). The defendant bears the burden of introducing evidence that the plaintiff could have reduced his damages. *Air Et Chaleur*, 757 F.2d at 494; *Jenkins v. Etlinger*, 55 N.Y.2d 35, 39, 447 N.Y.S.2d 696, 698, 432 N.E.2d 589, 591 (1982); *Cornell v. T.V. Development Corp.*, 17 N.Y.2d at 74, 268 N.Y.S.2d at 33, 215 N.E.2d at 352.

36. Here, the defendant has proved that the plaintiff was not as diligent as he could have been in mitigating his damages. The plaintiff did not seek any employment

for the first six months after he was discharged. Thereafter, his efforts to find new employment were not extensive. He registered with only a single employment agency and did not make a concerted effort to contact former customers or other prospective employers. COSI presented evidence that there is a demand for a person with plaintiff's experience and knowledge of mainframe computers and that such jobs pay in the comparable range of the plaintiff's former salary. On the other hand, the plaintiff presented evidence concerning the difficulty of his job search. The very fact that the employment agency produced so few concrete job opportunities is itself proof that Sudul's job search was genuinely difficult. The plaintiff argues that he has experience only with obsolete equipment and is not qualified for other employment; however, the plaintiff has a duty to mitigate his damages by seeking and accepting other employment of the same or substantially similar character.

37. Given all the factors in this case, including the plaintiff's failure to seek employment diligently and the difficulty of someone in the plaintiff's position in finding a job similar to his former job at COSI, the Court finds that the plaintiff should have been able to find new employment within two years, and his failure to find new employment after that time is attributable to his lack of diligent effort. The six-month period during which the plaintiff did not seek any employment, and thus did not mitigate his damages, should be subtracted from the two-year period of his unemployment. *See Ronder*, 184 A.D.2d at 240, 586 N.Y.S.2d at 749 (affirming lower court's denial of damages based on plaintiff's failure to use reasonable diligence to mitigate his damages after his employment was terminated); *see also Miller v. Swissre Holding, Inc.*, 771 F.Supp. 56, 62 (S.D.N.Y.1991) (Conboy, J.) (excluding from back pay calculations in Title VII action period of time when plaintiff was not looking for work).

■ 38. The plaintiff's damages should not include any amounts corresponding to the value of the health insurance benefits he would have been entitled to under his employment contract. The plaintiff's contract entitled him to a certain level of health insurance coverage. The contract did not, however, entitle him to any monetary compensation if he did not take advantage of this coverage. The plaintiff admitted that he never signed up for these benefits when he was employed because he relied on his wife's health insurance. He also testified that he is still covered by his wife's insurance and that this coverage is currently the same as it was while he was employed by the defendant. Therefore, the plaintiff today enjoys the same health insurance coverage as he did, by his own choice, while he was employed by COSI. Because he has suffered no change in his insurance coverage by reason of his discharge, he has suffered no injury for which he either needs to be or can be recompensed. *See, e.g., Proulx v. Citibank, N.A.*, 681 F.Supp. 199, 205 (S.D.N.Y.), *aff'd*, 862 F.2d 304 (2d Cir.1988) (cost to employer of fringe benefits plaintiff did not need would not be added to award).

■ 39. The plaintiff is, however, entitled to recover a nonaccountable automobile expense allowance of $15,600 per year. This allowance was part of his compensation and did not depend on the actual use of his car on COSI business. The defendant did not present any evidence to rebut the plaintiff's claim that this allowance was part of his income. *See Abady v. Interco Inc.*, 76 A.D.2d 466, 478, 430 N.Y.S.2d 799, 806–07 (1st Dep't 1980) (holding that $2,5000 drawing account used to cover unitemized expenses was part of plaintiff's income and therefore had to be included in the plaintiff's damage award).

■ 40. The parties agree that the plaintiff's damages must be reduced by the $7,800 the plaintiff received from unemployment insurance. *See New York State Human Rights of Complaint of Bice v. Parkview Auto Sales, Inc.*, 206 A.D.2d 888, 889, 616 N.Y.S.2d 113, 114 (4th Dep't 1994) (excluding amount of unemployment compensation from damages award); *Grumman Aerospace Corp. v. New York State Div. of Human Rights*, 151 A.D.2d 573, 573, 542 N.Y.S.2d 681, 682 (2d Dep't), *appeal denied*, 75 N.Y.2d 701, 551 N.E.2d 106, 551 N.Y.S.2d 905 (1989) (same); *Proulx*, 681 F.Supp. at 205.

**1050**

41. Therefore, the plaintiff is entitled to an award of damages for one-and-a-half years of lost income at the rate of $45,000 a year, amounting to $67,500, plus a car allowance of $23,400, less the $7,800 the plaintiff received as unemployment compensation, for a total award of $83,100.

## CONCLUSION

The parties are directed to submit a proposed judgment (including interest) by March 15, 1996. If the parties are unable to agree upon a proposed judgment, the parties are directed to submit counter proposals with an explanation of the differences. Any proposed judgment should include an explanation of the calculation of interest.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

**SO ORDERED.**