Jeffrey H. SADO, Plaintiff–Intervenor,

v.

Robin ELLIS, Robert Morrison and
Robin Ellis Productions, Ltd.,
Plaintiffs,

v.

Steven ISRAEL and One Times Square
Associates Limited Partnership, One
Times Square Management Corp., Old
Country Management Corp. and Marc
Washington, Defendants.

No. 90 Civ. 1634 (RO).

United States District Court,
S.D. New York.

April 18, 1995.

Jacobson & Colfin, New York City, for plaintiffs (Bruce Colfin, of counsel).

Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, New York City, for defendants (Daniel Hughes and Michelle Sullivan, of counsel).

Plaintiff–Intervenor Jeffrey Sado, pro se.

## OPINION AND ORDER

OWEN, District Judge.

Plaintiffs and defendants each move for summary judgment against plaintiff-intervenor Jeffrey Sado.[1] Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The non-moving party "cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (citations omitted). Rule 56(e) mandates:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. *If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.*

Fed.R.Civ.P. 56(e) (emphasis supplied). Sado *has* failed to oppose the motions, despite being given ample opportunity, and indeed being prodded, to do so. According to the summary judgment briefing schedule, Sado had two weeks to respond to the motions. When Sado failed to do so, I *sua sponte* granted him a further week's extension. Sado once again failed to respond, inexplicably choosing instead to use that time to prepare a twenty-six page, thirty-four exhibit motion for reargument of an earlier denied perjury motion, the validity of which had already been greatly questioned by me on the record at a conference.[2] This is also

---

1. Sado is *pro se* at this time, having parted with his lawyer without cause, as I determined after holding an evidentiary hearing.

2. The following is an excerpt from a January 20, 1995 conference.

THE COURT: I want to do this now, because Mrs. Sado, I am including you now here as a spokesperson. I am very, very troubled by the sweeping broad brush statements that everybody involved with this case, clients and every single lawyer that has been here has committed perjury. In this world, anything is possible. But the likelihood of what you have said about every single participant in this case committing perjury is highly improbable.

MR. SADO: Really.

THE COURT: It is. It is highly improbable and—

MR. SADO: And the fact they owe me a couple of million dollars—

THE COURT: No. Accordingly, what I want to get here, before I go into dealing with this sweeping document that does not have specifics, and, frankly this is against a background of letters such as the one of November 28th which speaks of something leading to Mr. Hughes and

to be viewed against earlier hearings, especially one involving the claim that Mr. Sado had threatened a lawyer in the case which, after hearing from the participants, I found he had, because Mr. Sado, under oath, basically acknowledged the threats in his phone call to the lawyer. Based not only on Mr. Sado's failure to oppose the motion, but also upon an assessment of the entire record, I conclude that summary judgment must be granted in favor of the moving parties.

*Facts*

This action arises out of a dispute over a corporate marketing proposal titled "Countdown 2000." The proposal was developed to garner corporate sponsorship of the Times Square New Year's Eve ball-drop ceremonies leading up to the year 2000. Defendant One Times Square Associates Limited Partnership ("OTSALP") was, during the time relevant to this litigation, the owner of One Times Square, the site of the ball-drop ceremony.[3] Defendant One Times Square Management Corp. managed the building, and defendant Old Country Management Corp. was the building's broker. Defendant Steven Israel was an OTSALP partner.[4] Israel met Sado in April of 1988, and the two orally agreed that Sado would work at One Times Square to lease office space within the building and to market the building as a location for television commercials and films. Later, Sado's role changed to include selling signage on the building's exterior. Israel provided Sado with a desk, secretary, telephone and information about One Times Square. Sado

was to function as an independent contractor, receiving $500 per week as a draw against any commissions earned.

When OTSALP purchased One Times Square in 1985, the building was subject to a pre-existing lease held by Van Wagner Advertising Corporation. Under the terms of that lease, Van Wagner had the right to sell signage on certain portions of the building's exterior. When Israel attempted to negotiate a signage deal with Pepsi–Cola, a dispute arose between Israel and Van Wagner over who had the rights to sell signage for the seventeenth floor terrace (alternatively referred to as the seventeenth floor setback). Israel claimed that the terrace was reserved for the building's owner, while Van Wagner maintained it was covered by its lease. In January of 1989, Van Wagner brought suit in New York State Supreme Court, claiming that OTSALP was violating the lease by soliciting Pepsi advertising. Van Wagner was granted a temporary restraining order enjoining OTSALP from displaying Pepsi ads. The order was subsequently lifted and Van Wagner was denied a preliminary injunction, because the judge found the lease to be ambiguous as to who had the signage rights to the terrace. *See infra* p. 1406. Van Wagner and OTSALP settled their differences by entering into an amended lease agreement which gave OTSALP a greater percentage of commissions for signs on the seventeenth floor terrace. Ultimately, Van Wagner entered into a signage contract with

---

Ms. Sullivan's false statements and a considerable number of these documents.

I, as the judge in this case am very troubled at what has the surface appearance of being irresponsible writing under the protection of immunity from suit for defamation because you happen to be a party and your own lawyer.

MR. HUGHES: It is qualified.

MR. SADO: I don't know why they haven't sued me if I made defamatory statements.

THE COURT: As you know, I have gotten complaints. I got a complaint from Ms. Shapiro, we held a hearing and it turned out on that hearing you practically admitted that you said to her what she claimed you said to her. I was—phrasing it appropriately without sounding overreaching—I had Ms. Sullivan come up to me when I am getting in the elevator last week about

your blocking her from leaving the courtroom the other day.

MR. SADO: More lies. I'm the bad guy, your Honor.

THE COURT: I am now met with a set of motion papers in which you have charged every single participant in this case being a perjurer. And I find this to be sort of like there is a garden hose out here that all you have to do is turn on the "perjury nozzle" and then you spray it.

MR. SADO: I don't do that, your Honor. This happened.

**3.** OTSALP purchased the building in 1985.

**4.** Marc Washington, a defendant in the original action, is no longer a party to this litigation, as Sado's complaint specifically exempts Washington.

Pepsi pursuant to the amended lease agreement.

Plaintiffs Robin Ellis and Robert Morrison, producers of live media events, entered the picture in March of 1989. At that time, Sado introduced them to Israel to discuss the production of a special event centering on the Times Square New Year's Eve ball-drops leading up to the year 2000. Israel provided Sado, Ellis and Morrison with information about One Times Square, such as diagrams and demographic studies, and Ellis and Morrison wrote a corporate marketing proposal. Although the proposal, known as Countdown 2000, was used by all the parties in an effort to obtain corporate sponsorship, no income was ever generated by it. Ellis and Morrison copyrighted the proposal in their names, leading to a dispute with Israel and OTSALP that resulted in the current litigation.

In March 1990, plaintiffs brought suit against defendants alleging copyright infringement, unfair competition, breach of contract and unjust enrichment. In May 1991, Sado sought and was granted leave to intervene, claiming that he initiated Countdown 2000 and was entitled to commissions allegedly generated by the proposal. He originally asserted five causes of action, but he later amended his complaint to withdraw two of the claims. Three causes of action remain. First, Sado alleges that plaintiffs fraudulently registered his original intellectual property and failed to give him credit for it. Second, he alleges that defendants fraudulently induced him to enter into a co-brokerage agreement to sell signage when they knew that Van Wagner had a restrictive covenant on new signage. Finally, Sado alleges that plaintiffs and defendants conspired to deprive him of rights deriving from the Countdown 2000 proposal. Plaintiffs and defendants eventually settled their case in 1993. Although Sado was invited to take part in the settlement negotiations, he declined to do so. Plaintiffs and defendants now move for summary judgment, and, for the reasons set forth below, the motions are granted.

*Count One*

■ Plaintiffs move for summary judgment on count one of Sado's amended complaint. Count one alleges that Sado con-

ceived of Countdown 2000 and that plaintiffs "wrongfully, maliciously, intentionally and fraudulently, without Sado's authorization and in wanton disregard of Sado's rights, registered Sado's original intellectual property in copyright application PAN 130–6–62 listing only the plaintiffs as authors and owners and failed to give Sado the credit to which he is entitled as author/owner." Sado claims he is entitled to damages reflecting his equity interest, as well as a declaratory judgment declaring him a 33⅓ owner of the Countdown 2000 proposal and directing plaintiffs to file an amended registration form crediting him as the author/owner of the proposal. It is unclear what legal claim Sado is putting forth with these allegations. Plaintiffs construe count one as a claim of conversion and for declaratory judgment of co-authorship. Regardless of what formal construction is placed on Sado's allegations, count one must fail because Sado has failed to adduce any evidence of the facts he asserts.

Sado alleges that he was the "author/owner" of the Countdown 2000 proposal. However, his own words contradict these assertions. The following are excerpts from Sado's October 1994 deposition.

Q: I'm going to make this easy. What I want you to do, Jeffrey [Sado], is I want you to go through the corporate sponsorship proposal and show me the pages that you wrote, okay? Show me what you wrote and you can also include the photographs that you own, okay? I do not want you to mention the pages that belong to other people that you provided. I just want to know exactly what you own.

A: My intellectual property would encompass . . . input.

Q: I'm looking at his proposal. I want to see in his proposal what you wrote. I don't want to talk about generalities as to intellectual property.

A: Everything came off Robin Ellis' computer. I did not write this document.

Plaintiffs' Exhibit A at 155.

Q: But you never wrote your own proposal?

A: I did not copyright and plagiarize like Robin Ellis did. I did not.

Plaintiffs' Exhibit A at 162.

Q: In the last five years, is it true you did not write a proposal to exploit your idea?

A: It is true I have not written a Countdown 2000 proposal specifically for Times Square because it is under a court case right now and I'm not going to waste my time.

Plaintiffs' Exhibit A at 165. *See also* Plaintiffs' Exhibit A at 130, 134, 137–38, 142, 147.

Sado also asserts in count one that Countdown 2000 was his "original intellectual property." Nevertheless, he has stated several times that the Countdown 2000 concept originated with the Millennium Society and that he believed it to be in the public domain.

Q: You developed an idea of this New Year's Eve?

A: Right, Countdown 2000.

Q: Where did you take that idea? Because obviously you claim it was stolen from you, so who did you take it to?

A: To give you further background, I want to be honest with you, it wasn't originally mine. I was working with the Millennium Society.

Plaintiffs' Exhibit B at 10.[5]

Q: It is your understanding then that the name Countdown 2000 was in the public domain [in the summer of 1988]?

A: It is my understanding it was in the public domain.

Plaintiffs' Exhibit A at 100. Sado has also stated that he never had any intention of copyrighting the proposal. *See* Plaintiffs' Exhibit A at 130. Additionally, Sado has not demonstrated any damages flowing from the acts alleged in count one. *See* Plaintiffs' Exhibit A at 98, 103–04.

Thus, Sado's own words belie the assertions he makes in count one. Because there is no factual basis for Sado's allegations, plaintiffs are entitled to judgment as a matter of law as to count one.

*Count Four*

■ Defendants move for summary judgment on count four of Sado's amended complaint. In count four, Sado alleges that defendants "knowingly, intentionally, maliciously and fraudulently, and with intent to deceive [him], concealed the existence of the Van Wagner lease from [him] and fraudulently induced [him] to enter into the co-brokerage agreement ... and to expend time and effort to sell signage."[6] Sado is thus alleging the tort claim of fraudulent inducement. Under New York law, which is controlling on the issue of fraud,[7] Sado must prove the following elements of fraudulent inducement: misrepresentation of a material fact, falsity, scienter, reliance and injury. *Channel Master Corp. v. Aluminum Ltd. Sales*, 4 N.Y.2d 403, 406–07, 176 N.Y.S.2d 259, 261, 151 N.E.2d 833, 835 (1958); *Browning Ave. Realty v. Rubin*, 207 A.D.2d 263, 615 N.Y.S.2d 360, 363 (1st Dep't 1994). These elements must be established by clear and convincing evidence, *Simcuski v. Saeli*, 44 N.Y.2d 442, 452, 406 N.Y.S.2d 259, 264, 377 N.E.2d 713, 718 (1978), and failure to prove any of the elements will nullify the claim.

■ The misrepresentation Sado charges is one of concealment. That is, Sado claims that Israel concealed the existence of the Van Wagner lease and induced him to enter into a signage agreement precluded by the lease. Where concealment, as opposed to an affirmative misrepresentation, forms the basis of a fraudulent inducement claim, the inquiry turns on whether there was a duty to disclose. *See East 15360 Corp. v. Provident Loan Soc'y*, 177 A.D.2d 280, 575 N.Y.S.2d 856, 857 (1st Dep't 1991). A duty to disclose will exist where there is a fiduciary relationship. *Id.* 575 N.Y.S.2d at 857. Sado has

---

5. May 6, 1994 hearing before the Court.

6. The logic of this claim has always escaped the Court. Why would Israel, et. al, have furnished Sado office space and services and given him advances against commissions and then assigned him, among others, a task he could not accomplish—and have done so *fraudulently*? It appears it did not happen, as the now-developed facts hereafter spell out.

7. *See* 28 U.S.C. § 1652; *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, *cert. denied*, 305 U.S. 637, 59 S.Ct. 108, 83 L.Ed. 410 (1938).

adduced no evidence of such a relationship; in his own words, he was an independent contractor with OTSALP. *See* Defendants' Exhibit H at 15; Exhibit 3 at 2.

■ Even assuming the concealment to be a misrepresentation, Sado must prove that it was false. *Lovett v. Allstate*, 86 A.D.2d 545, 446 N.Y.S.2d 65, 67 (1st Dep't 1982), *aff'd* 64 N.Y.2d 1124, 490 N.Y.S.2d 187, 479 N.E.2d 823 (1985). In other words, he must prove that Israel concealed from him a lease which precluded him selling signage.[8] Sado has not met this burden. In fact, the lease was ambiguous as to who had the right to sell signage on certain portions of the building. The findings of the state court in the Van Wagner litigation, while not binding on this court, are instructive. Van Wagner brought suit, alleging that Israel was violating the lease by attempting to sell signage to Pepsi. Although State Supreme Court Justice Cohen initially granted Van Wagner a temporary restraining order, he later denied a motion for preliminary injunction, stating:

> [Van Wagner] claims that the provisions of the lease are clear and unambiguous and demonstrate its likelihood of success on the merits. This court disagrees. Section 2.01 of the lease specifically reserves to the defendant lessor the roofs of the Building.... Section 16.01 of the lease forbids the defendant lessor from placing advertising displays on the roof or any part of the exterior walls of the Building. It is silent, however, as to the window areas and open landings on the Building, which pursuant to Section 2.01 are reserved for the lessor. Defendant contends that the alleged Pepsi

Cola display which plaintiff claims defendant is going to place on the 17th floor falls into this exception.

Defendants' Exhibit S at 5. The ambiguity is further evidenced by the fact that Van Wagner and OTSALP settled their differences by entering into an amended lease agreement which gave OTSALP a greater percentage of commissions for signs on the 17th floor terrace.[9] The lease was ambiguous and did not, on its face, prevent Israel (or Sado as his representative) from securing signage for the seventeenth floor terrace. Thus, even if Israel concealed the Van Wagner lease from Sado, such concealment could not form the basis of a fraudulent inducement claim.

Failure to prove a triable issue of false representation is dispositive of the fraudulent inducement claim. Nevertheless, I will briefly address the other elements of the claim—scienter, reliance and damages. Scienter, or knowledge that a representation is false, is an essential element of a fraud claim. *Browning, supra*, 615 N.Y.S.2d at 363. Sado has failed to adduce evidence that Israel believed the Van Wagner lease covered the seventeenth floor terrace.[10] In fact, Sado spoke to the contrary during a deposition taken in the course of the Van Wagner litigation:

> Q: Were you told by Mr. Israel or anyone else on behalf of One Times Square that there might be restrictions applicable to [the seventeenth floor setback]?
>
> A: No, [Israel] firmly believed all along that this setback was not a conflict.

8. When asked during his deposition what misrepresentations he relied upon to his detriment, Sado replied in part: "[Israel] actively encouraged me on a daily basis to deliver signage tenants for his available locations as he told me they were all immediately available.... He withheld the entire Van Wagner file and lease in conflict during that whole time frame.... He had no right whatsoever to sell signage during that time frame. They were all tied up with Van Wagner. So I feel withholding of that information was vital. I wouldn't have wasted my time for all those months prior to bring in a sign tenant." Defendants' Exhibit I at 80–81.

9. Under the original lease, Van Wagner received 75% of advertising revenue in excess of $400,-

000, and OTSALP received 25 per cent. In contrast, the new lease provided that OTSALP would receive 72.5% of revenue generated by the seventeenth floor terrace, as well as the right to approve the advertiser. The adjusted schedule also applied to revenues generated by two other disputed areas.

10. In contrast, Israel has presented evidence indicating that *he* believed the terrace to be excluded from the Van Wagner lease. In a letter to Van Wagner's president dated December 6, 1988, Israel wrote: "[P]ursuant to Article 2 of your Lease, you have *absolutely no right* to locate a sign on any setbacks of One Times Square." Defendants' Exhibit N.

Defendants' Exhibit G. Moreover, Sado stated during the same deposition that he himself did not think the seventeenth floor setback was in conflict with the Van Wagner lease.[11]

■ Sado has also failed to adduce evidence of reliance. Even assuming that Israel concealed the Van Wagner lease from Sado, Sado's own statements demonstrate that he knew of its existence.[12] Moreover, under New York law, a party cannot claim reliance on a misrepresentation where he could have discovered the truth with ordinary diligence. *Provident, supra,* 575 N.Y.S.2d at 857. In this case, the Van Wagner logo was displayed prominently on the Minolta sign which dominated the facade of One Times Square. *See* Defendants' Exhibit K. Sado could have ascertained the existence of the lease simply by viewing the Minolta sign. In fact, Sado has admitted to examining and photographing the Minolta sign.[13] In sum, there is no issue of reliance.

■ Finally, Sado has not demonstrated damages. By alleging fraudulent inducement to enter into a co-brokerage agreement,

Sado is asserting an independent tort claim and *not* a contract claim. Thus, he is required to allege damages distinct from contract damages. *See Tesoro Petroleum v. Holborn Oil,* 108 A.D.2d 607, 484 N.Y.S.2d 834, 835 (1st Dep't 1985). He has not. In his complaint, Sado alleges damages "in the amount of at least $195,000 or at least 10% of the value of any contract related to sponsorship of the ball-lowering, New Year's Eve ceremony, at least 8⅓% of the value of any Pepsi contract for permanent signage or at least an amount in excess of $660,000, and ... punitive damages." When asked during deposition how the alleged concealment of the Van Wagner lease resulted in these damages, Sado replied: "I'm damaged, you know, financially. I lost hundreds of thousands of dollars because Pepsi did their deal. ... I was promised eight and a third percent of 16 and two-thirds percent commission." Defendants' Exhibit I at 81.[14] In essence, Sado is claiming that Israel broke his promise and breached the co-brokerage agreement. The damages alleged thus flow from a contract, and not from a fraud.[15] Contract damages

---

11. Sado stated: "It's my belief then that the seventeenth floor setback was not a problem. ... It's not in conflict with Van Wagner's lease." Defendants' Exhibit G at 14.

12. The following are excerpts from the deposition of Sado taken during the Van Wagner litigation.

Q: At any time starting in May of 1988 going forward, were you told by Mr. Israel or anyone else as to what rights, if any, Van Wagner had concerning exterior space at the building?
A: No, I was never aware of—I never read the Van Wagner lease. I don't know for sure.
Q: You were never told by Mr. Israel or anyone else as to what restrictions, if any, might be in that lease?
A: I was aware that there might have been restrictions. The details of the restrictions, I don't know.
Q: How were you aware?
A: Just from being in the office, hearing discussions, you know; and I did know that he had wished to maybe come to some kind of settlement of this, aside from going to court. Defendants' Exhibit G at 12.

＊ ＊ ＊ ＊ ＊ ＊

Q: You knew, did you not, that the Minolta sign was a sign that had been placed there under an arrangement with Van Wagner advertising?
A: Yes.

Defendants' Exhibit G at 34.

13. The following exchange is from Sado's deposition of October 1994.

Q: From April of '88 to the end of November of '88 about how many different pictures did you take of the Minolta sign, would you guess?

＊ ＊ ＊ ＊ ＊ ＊

A: Many pictures. I would, you know, guess—you are asking to pin me down to something I have no idea. It was many pictures; many rolls of film.

14. Sado is referring to a contract Pepsi entered into with OTSALP to sponsor the New Year's Eve ball-drop for five years. Pepsi paid $400,000.00 to sponsor the ball-drop for one year, but then elected to terminate the contract, making a penalty payment of $200,000.00. Defendants received $90,000.00 in commissions.

15. Sado's confusion over fraud and contract claims was apparent during a March 17, 1993 hearing.

Q: No damages flowed from that fraud if it was a fraud, because even if he didn't have the rights he ended up getting the rights and you ended up getting the clients, right?
A: He's been denying that I got the clients.
Q: That's another matter.
A: It just appeared to be to be fraud.

cannot form the basis of injury for Sado's fraud action, putting to one side the fact that no contract has even been pled in this action.[16]

Sado has adduced no evidence of fraudulent inducement and thus count four fails as a matter of law.

*Count Five*

 Sado's fifth cause of action alleges that plaintiffs and defendants "knowingly, intentionally, maliciously and tortiously conspired together to deprive Sado of his rights in the Countdown 2000 proposal, the copyright related thereto, and his rights to the Pepsi commission." This claim is governed by New York law,[17] which does not recognize an independent tort of civil conspiracy. *See Green v. Davies,* 182 N.Y. 499, 75 N.E. 536 (1905); *Legion Lighting Co. v. Switzer Group, Inc.,* 171 A.D.2d 472, 567 N.Y.S.2d 52 (1st Dep't 1991). Under New York law, "a mere conspiracy to commit a [tort] is never of itself a cause of action." *Alexander & Alexander v. Fritzen,* 68 N.Y.2d 968, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986) (citations omitted). An independent tort must form the basis of a claim of civil conspiracy. *See Demalco v. Feltner,* 588 F.Supp. 1277, 1278 (S.D.N.Y.1984); *Smukler v. 12 Lofts Realty,* 156 A.D.2d 161, 548 N.Y.S.2d 437, 439 (1st Dep't 1989), *app. den.,* 76 N.Y.2d 701, 557 N.Y.S.2d 878, 557 N.E.2d 114 (1990). Sado has adduced no evidence that plaintiffs and defendants were joint tortfeasors.[18] In fact, he has not even alleged a joint tort in his complaint. Count one of the complaint asserts that plaintiffs registered Sado's original intellectual property in their own names and failed to give him credit. Count four of the complaint alleges that defendants fraudulently concealed the Van Wagner lease and induced Sado to enter into a co-brokerage agreement.[19] Count five, which alleges the conspiracy, neither links up counts one and four nor alleges an independent tort committed jointly by plaintiffs and defendants. It is clear that Sado's fifth cause of action must fail as a matter of law.

In closing this opinion which rules against Mr. Sado on an assessment of the facts as established in the main from his own admissions at prior hearings and depositions, I can now note that his willful and deliberate default in responding to this motion appears in a less puzzling light than at first. Accordingly, plaintiffs' motion for summary judgment on counts one and five of the amended complaint and defendants' motion for summary judgment on counts four and five is granted, and plaintiff-intervenor Sado's complaint is dismissed in its entirety, together with costs and disbursements to be taxed by the clerk.[20]

The foregoing is so ordered.

---

**16.** I note that the alternative to interpreting Sado's alleged damages as contract damages similarly defies logic. *See also* note 6 *supra.* Sado would be claiming simultaneously that Israel's fraud precluded him from bringing in clients *and* that he was being cheated out of commissions for clients he brought in.

**17.** *See* note 7 *supra.*

**18.** In his deposition, Sado points not to torts, but to lawful acts, as the basis for his conspiracy claim.

Q: Other than the tolerance of the litigation for four and a half years, the settlement of the litigation between Ellis and Israel and this [profile of the Countdown 2000 producers, naming Ellis, Morrison and Israel], do you have any other evidence of conspiracy by my clients to deprive you of your rights to Countdown 2000, the copyright thereto and your right to the Pepsi commission?

A: I think that—I don't want to limit and say that that's everything at this moment, because it might not be, but I think that pretty much covers it.

Defendants' Exhibit H at 211.

**19.** Counts two and three were withdrawn on motion by Sado.

**20.** In the procedural and factual context of this motion, the denial on July 7, 1994, of plaintiff Ellis' summary judgment motion is no bar to the result reached here. The result there reached was based on Sado's unsworn responses and explanations as to some otherwise very damaging admissions, in the setting of Sado being a pro se intervenor.