**Steven A. GREENBERG, Plaintiff,**

**v.**

**Steven CHRUST, Defendant.**

**No. 01 Civ. 10080(RWS).**

United States District Court,
S.D. New York.

Sept. 10, 2003.

Olshan Grundman Frome Rosenzweig & Wolosky, New York, NY (Thomas J. Fleming, Kenneth J. Rubinstein, Michael B. Fisher, of counsel), for plaintiff.

Graubard Miller, New York, NY (Edward H. Pomeranz, Nancy R. Sills, of counsel), for defendant.

### OPINION

SWEET, District Judge.

Defendant Steven Chrust ("Chrust") renews a motion for summary judgment against plaintiff Steven A. Greenberg ("Greenberg") pursuant to Federal Rule of Civil Procedure 56(b).

For the reasons set forth below, defendant's motion for summary judgment is granted.

### Prior Proceedings

This action was commenced on November 14, 2001, by the filing of a complaint alleging causes of action for (1) common law fraud; (2) securities fraud; (3) negligent misrepresentations; and (4) breach of fiduciary duty.

Discovery has been completed, and various motions have been disposed of. *See Greenberg v. Chrust,* 198 F.Supp.2d 578 (S.D.N.Y.2002) (*"Greenberg I"*); *Greenberg v. Chrust,* No. 01 Civ. 10080, 2002 WL 31444902, 2002 U.S. Dist. LEXIS 21103 (Oct. 31, 2002) (*"Greenberg II"*); *Greenberg v. Chrust,* No. 01 Civ. 10080, 2003 U.S. Dist. LEXIS 2209 (S.D.N.Y. Feb. 10, 2003) (*"Greenberg III"*).

In December 2001, Chrust moved to dismiss Greenberg's complaint, and in *Greenberg I,* his motion to dismiss was granted in part and denied in part, stating:

> The allegations in the complaint regarding Chrust's misrepresentation of his employment background and business acumen (i.e. that he resigned his position at Winstar, that he successfully aided small companies, and that he managed a successful hedge fund) satisfy the requirements for a fraud claim. Greenberg has alleged that such representations were false and known to be false when made; that they were made to induce Greenberg to contribute his shares back to the company; and that Greenberg relied on these representations and was injured as a result.
>
> \* \* \* \* \* \*
>
> Greenberg has with sufficient particularity, specified the statements made by defendant which were fraudulent, identified who made the statements, when they were made (to plaintiff and others on various occasions prior to defendant's retention as chairman of the board) and why they were fraudulent.

*Greenberg I* at 582, 583.

In *Greenberg II,* Chrust's motion for summary judgment was denied "with leave granted to renew at the close of discovery." *Greenberg II* 2002 WL 31444902, \*3,

2002 U.S. Dist. LEXIS 21103, at 8. Disputed issues of material fact included:

> the circumstances of Chrust's departure from Winstar, the representations Chrust made regarding his employment status prior to his retention by Worlds, his work with various small companies, and involvement with a hedge fund prior to his retention by Worlds, the provision and availability of certain materials regarding Chrust's background, and the cause for movement in Worlds' stock price between March 23, 1999 and April 13, 1999.

*Id.* at 2002 WL 31444902, *3, 2002 U.S. Dist. LEXIS 21103, **6–7. This was the case since "[w]hether or not Chrust was under a duty to disclose his employment depends upon [his] prior statements," and it was also unclear "whether the statements regarding Chrust's successes are merely statements of opinion and non-actionable." *Id.* at 2002 WL 31444902, *3, 2002 U.S. Dist. LEXIS 21103, **7–8.[1]

Since then, the following additional material was collected through discovery:

(1) Greenberg's deposition;

(2) Chrust's deposition;

(3) the deposition of non-party witness William Rouhana, Jr. ("Rouhana"), Winstar's former Chairman and Chief Executive Officer; and

(4) the minutes of Winstar's Board of Directors, produced by Winstar's bankruptcy trustee.

Chrust's current fraud claim is based on three different categories of misrepresentations, which he alleges induced Greenberg to contribute his personal securities to Worlds in connection with Chrust's retention. These misrepresentations involved:

(1) Chrust's departure from Winstar;

(2) Chrust's continued affiliation with Winstar after his departure; and

(3) Chrust's business and employment background.

The instant motion was heard and marked fully submitted on June 25, 2003.

### The Facts

The facts are set forth based upon the Local Rule 56.1 statements of the parties and supporting declarations.

Greenberg, a New York resident, was one of three founders of Worlds Acquisition Corp., a corporation formed in 1997 for the purpose of acquiring Worlds, Inc. In December 1997, a three-way merger between Worlds Acquisition Corp., Worlds, Inc., and Academic Computer Systems, Inc., was effected. The surviving corporation was called Worlds, Inc. On November 9, 1999, Worlds, Inc. changed its name to Worlds.com ("Worlds").

Chrust, a Connecticut resident, participated as an investor in the financing related to the merger. He was employed as the vice-chairman of Winstar Communications, Inc. ("Winstar"), a publicly traded company engaged in the telecommunications industry. In December 1998, Chrust contacted Greenberg to inquire about possible involvement with Worlds.

Chrust and Greenberg met on at least six occasions between January 3, 1999 and April 8, 1999, during which Chrust made certain representations which form the basis for the instant action. According to Greenberg, Chrust stated that he had re-

---

1. In *Greenberg III*, Chrust's motion for sanctions against Greenberg, pursuant to Fed. R.Civ.P. 11, was denied, stating:

> A defendant's verdict, when the credibility of the parties is the principal issue, might well establish the basis for sanctions against Greenberg, given the record as it appears at this time. Under these circumstances it is prudent to defer this application for sanctions until the final disposition of this action.

*Greenberg III* at 2.

signed voluntarily as Winstar's vice president and member of the board, that he was no longer employed or affiliated with Winstar, that he had worked successfully with small companies in the past aiding in their financing, development, and growth, and that he had managed a hedge fund with a growth rate of 25% annually, in which he personally invested approximately $10 million.

Pursuant to these discussions, Greenberg agreed to support Chrust as chairman of World's board of directors. On March 23, 1999, Worlds entered into an agreement with SGC Advisory Services, Inc. ("SGC"), whose president was Chrust, under which SGC was retained as a consultant and Worlds became obligated to appoint Chrust as chairman of its board of directors (the "SGC Agreement"). The agreement provides that SGC and Chrust could consult with other businesses, without limitation, while SGC was consulting with Worlds. Neither Greenberg nor Chrust was a direct party to this agreement.

On April 13, 1999, Greenberg and two other Worlds shareholders entered into an agreement in which they agreed to contribute certain amounts of their Worlds shares back to Worlds (the "Contribution Agreement"). Greenberg agreed to contribute 881,750 shares of his Worlds stock back to Worlds.

Prior to entering into the Contribution Agreement, Greenberg owned at least 3,818,250 shares of Worlds common stock. (Greenberg alleges ownership of 4.7 million shares).

Chrust entered into an agreement to continue rendering consulting assistance to Winstar for a period of one year after his resignation as vice-chairman.

Chrust became chairman of Worlds which thereafter became insolvent. Chrust has extensive experience in evaluating investment opportunities in public and private technology and worked with telecommunications companies, most, if not all, of which are bankrupt or on the verge of bankruptcy and are out of business according to Greenberg.

## I. *The Summary Judgment Standard*

Summary judgment is granted only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see generally* 6 James Wm. Moore, et al., Moore's Federal Practice ¶ 56.15 (2d ed.1983). The court will not try issues of fact on a motion for summary judgment, but, rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Bickhardt v. Ratner*, 871 F.Supp. 613 (S.D.N.Y.1994) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, "[s]ummary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."

*Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997).

## II. *Fraud Standard*

■ As previously held,

A New York common law fraud is defined as a "representation of fact which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 104 (2d Cir.2001). Therefore, in an action to recover damages for fraud under New York law, the plaintiff must allege: (1) a misrepresentation or a material omission of fact which was false and known to be false by defendant; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury. *AUSA Life Ins. Co. v. Ernst and Young,* 206 F.3d 202, 208 (2d Cir.2000) (*citing Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 646 N.Y.S.2d 76 (1996)).

*Greenberg I* at 582.

## III. *Discussion*

### A. *Chrust's Departure from Winstar Does Not Provide the Basis of a Fraud Claim*

■ Greenberg alleges that Chrust "failed to disclose that he was forced to resign as vice chairman and as director of Winstar as a result of acts of misconduct and certain improprieties." (Compl.¶¶ 11, 17.) However, the evidence shows that Chrust's departure from Winstar was vol-untary, and thus his representations to this effect cannot form the basis of a fraud claim. Rouhana, Winstar's former chairman and chief executive officer, specifically testified that Chrust's resignation was not the result of any misconduct or improprieties. Rather, Chrust's resignation stemmed from Winstar's rapid expansion and Chrust's desire to work with small start-up companies. Chrust's services continued to be valued and sought out at Winstar even after his resignation. Thus, Chrust's amended employment agreement provides for him to continue consulting with Winstar's senior management and to receive a $350,000 salary.

■ In support of his fraud claim, Greenberg submits the transcript of a telephone conversation between Gerald Brodsky ("Brodsky") and himself, which he recorded, regarding Chrust's departure from Winstar. In that conversation, Brodsky, who was never affiliated with Winstar, describes a conversation he allegedly had with Rouhana and a conversation he allegedly had with Amy Newmark ("Newmark"), a former Winstar employee who eventually became Rouhana's wife.[2]

The telephone conversation with Brodsky is inadmissible hearsay, pursuant to Fed.R.Evid. 802. Brodsky's recitation of Newmark's alleged statements is further most likely hearsay within hearsay since, as Greenberg has already conceded:

[I]t is highly reasonable to infer that any information derived from Ms. Newmark came from none other than her husband, Mr. Rouhana, as Ms. Newmark was not on the Winstar Board and could not have otherwise known these facts.... Defendant's commentary regarding plaintiff's failure to seek the depositions

---

**2.** In his affidavit, Brodsky states: "At no time did William Rouhana tell me that Mr. Chrust left Winstar because of improprieties. Therefore, at no time did I ever tell Mr. Greenberg that Mr. Rouhana said that Chrust had been forced or pressured to resign from Winstar because of improprieties." (Rubenstein Decl., Ex. 15.)

of Mr. Brodsky or Ms. Newmark is spurious. There is little, if any, reason to proceed with these depositions as it [is] clear that the only person with *actual* knowledge would be Mr. Rouhana (or other members of the Winstar Board). Mr. Brodsky already told plaintiff what information he had to share and the source for Ms. Newmark's knowledge and information is undoubtedly her husband, Mr. Rouhana.

(Pomeranz Aff. at 9.)

Therefore, this telephone conversation is insufficient to raise an issue of fact on a motion for summary judgment. Fed. R.Civ.P. 56(e) provides in pertinent part that: "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *See also Hollander v. American Cyanamid Co.,* 172 F.3d 192, 198 (2d Cir.1999) (affirming the district court's grant of summary judgment and striking of an affidavit opposing summary judgment as it "flagrantly disregarded the requirements of Rule 5(e)" and was "riddled with inadmissible hearsay, conclusory statements and arguments, and information clearly not made on the affiant's personal knowledge"); *United States v. Carlin,* 948 F.Supp. 271, 275 (S.D.N.Y. 1996) ("Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits opposing summary judgment 'be made on personal knowledge.' ").

As Chrust's departure from Winstar was voluntary, his representation to that effect cannot form the predicate for a fraud claim. *Sado v. Ellis,* 882 F.Supp. 1401, 1406 (S.D.N.Y.1995) (granting summary judgment because "[f]ailure to prove a triable issue of false representation is dispositive" of a fraud claim); *Lovett v. Allstate Ins. Co.,* 86 A.D.2d 545, 446 N.Y.S.2d 65 (1st Dep't 1982) (granting summary judg-

ment where plaintiff failed to come forward with evidence of falsity); *aff'd,* 64 N.Y.S.2d 1124, 490 N.Y.S.2d 187, 479 N.E.2d 823 (1985).

### B. *Chrust's Continued Affiliation with Winstar Does Not Provide the Basis of a Fraud Claim*

Greenberg claims that he relied on Chrust's alleged representation that he was no longer affiliated with Winstar in tendering his shares back to Worlds, and that the representation was important to him because he wanted to "ensure that the defendant would devote sufficient time to Worlds." (Pomeranz Aff. ¶ 33.)

#### 1. *Chrust's Continued Affiliation with Winstar was Available to Greenberg Before He Tendered His Shares*

Under New York law, where "sophisticated parties are engaged in arm's length negotiations and the party claiming reliance had an opportunity to discover the information allegedly relied upon, New York courts are wary of finding that such reliance was reasonable." *Manley v. AmBase Corp.,* 126 F.Supp.2d 743, 758 (S.D.N.Y.2001). *See also Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 98 (2d Cir.1997) ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance"); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 165 F.Supp.2d 615, 623 (S.D.N.Y.2001) ("[T]he sophisticated investor . . . must show that he or she had made an independent inquiry into all available information").

Here, Greenberg is a sophisticated businessman and investor, and he described the transaction at issue, where he contrib-

uted back more than 881,000 shares of stock to Worlds, as "extremely important" to him. (Pomeranz Aff. ¶ 31.)

Prior to tendering his shares in September 1999, Greenberg was on notice that Chrust maintained some affiliation with Winstar. Greenberg communicated with Chrust via e-mail in May 1999 at a Winstar address, and Chrust's affiliation with Winstar was also a matter of public record. Winstar's April 1999 SEC filing sets forth the terms of Chrust's continued affiliation with Winstar. Greenberg had access to this information on the internet through the SEC's EDGAR service.[3]

Greenberg points out that Winstar's April 1999 SEC filing was not filed until on or about May 7, 1999, while the Contribution Agreement was entered into on April 13, 1999. Greenberg would thus have had access to the filing before tendering his shares in September 1999, but not before entering into the agreement. Greenberg further claims that Chrust failed to disclose his continuing employment with Winstar in Worlds' SEC filing. This filing took place after Chrust's retention by Worlds.[4]

### 2. *Chrust's Continuing Affiliation with Winstar is Immaterial*

In any case, Chrust's continuing affiliation with Winstar is immaterial to Greenberg's decision to contribute his stock back to Worlds. "A misrepresentation is material to a fraud claim only if it is the type of misrepresentation likely to be deemed significant to a reasonable person considering whether to enter into the transaction." *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 170 (2d Cir.1999). A representation is immaterial where it is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 162 (2d Cir.2000) (*quoting Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985)); *see also Halperin v. EBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir.2002).

In this case, Chrust's continuing affiliation with Winstar is immaterial because he was explicitly allowed to perform work for other companies under the SGC Agreement.[5] The SGC Agreement provides that Worlds:

> acknowledges that Consultant or its affiliates are in the business of providing final services and consulting advice to others. Nothing herein contained shall be construed to limit or restrict Consultant in conducting such business with others, or in rendering such advice to others.

(SGC Agreement § 7.)[6] Additionally, under this agreement, Chrust was not re-

---

3. Greenberg's argument that he did not have access to the internet is disingenuous. Although Greenberg claims not to have had internet access at home and that at work he used his secretary's computer for e-mail purposes only, Greenberg's secretary had access to the internet. Greenberg further testified that he would instruct his secretary to search for particular information on the internet. (Pomeranz ¶¶ 37, 43.) Moreover, in this day and age, the internet is accessible from multiple public venues.

4. Interestingly, as noted by Greenberg, both Winstar and Worlds were represented by the same counsel in their filings.

5. The SGC Agreement draws no distinction between consulting services provided within or outside the context of an employment agreement.

6. The SGC Agreement further contains a merger clause, which states that it "constitutes the entire agreement between the parties with respect to the subject matter hereof. No provision of this Agreement may be amended, modified or waived, except in writing signed by both parties." (SGC Agreement § 30.)

quired to spend any particular amount of time performing services on behalf of Worlds. (SGC Agreement § 2 ("Consultant shall provide the company with such regular and customary financial consulting advice as is reasonably requested by the Company.... Consultant shall not be obligated to spend any specific amount of time in so doing.").) Thus, under the SGC Agreement, Chrust could freely provide services to Winstar.

▪ Although Greenberg was not a party to the SGC Agreement, he negotiated its terms, reviewed it before it was signed, and incorporated its terms by reference into the Contribution Agreement to which he was a signatory.[7] (Pomeranz Reply Aff., ¶¶ 32–37.) Since Chrust knew of and helped craft an agreement that allowed Chrust to work for any company, for any amount of time, and without limitation, he cannot reasonably have relied upon a representation that Chrust no longer provided his services to Winstar. "Under New York law, reasonable reliance is precluded when 'an express provision in a written contract contradicts a prior alleged oral representation in a meaningful fashion.'" *Republic Nat'l Bank v. Hales*, 75 F.Supp.2d 300, 315 (S.D.N.Y.1999); *see also Bango v. Naughton*, 184 A.D.2d 961, 963, 584 N.Y.S.2d 942, 944 (3d Dep't 1992) ("[C]onflict between the provisions of the written contract and oral representations negates the claim of reliance upon the latter."). Furthermore at his deposition, Greenberg admitted that prior to tending his shares to Worlds, he knew Chrust was providing consulting services to another company, U–Magic Services, Inc., at the same time that he was providing services to Worlds. (Pomeranz Aff., ¶ 29 fn.).

### C. Chrust's Business and Employment Background Does Not Provide the Basis of a Fraud Claim

### 1. Chrust's Alleged Representation He Worked Successfully with Small Businesses

▪ Greenberg claims that he was also induced to contribute stock back to Worlds by Chrust's misrepresentation that he "successfully worked with small companies in the past and aided in their financing and development." (Pomeranz Aff. ¶ 39.) Greenberg alleges that contrary to Chrust's representation, he was associated as an officer and/or director with numerous companies whose businesses "floundered, failed, or went bankrupt."

Chrust responds that any statements previously made regarding his past successes with small businesses are statements of opinion and non-actionable. In *Greenberg II*, this question was reserved "[b]ecause of issues of disputed material fact." *Greenberg II*, 2002 WL 31444902, *3, 2002 U.S. Dist. LEXIS 21103, at *8 ("Also at issue is whether the statements regarding Chrust's successes are merely statements of opinion and non-actionable.").

▪ As settled, representations constituting "mere opinion or puffery" are "not actionable representations of fact." *Reich v. Mitrani*, 268 A.D.2d 256, 701 N.Y.S.2d 368, 369 (1st Dep't 2000); *see also Jacobs v. Lewis*, 261 A.D.2d 127, 689 N.Y.S.2d 468, 468 (1st Dep't 1999) (holding that purported misrepresentations regarding defendant's background expertise and promises "amounted to no more than opinions and puffery or ultimately unfulfilled promises, and in either case were not ac-

---

7. The Contribution Agreement explicitly states that it was entered into "in connection with" the SGC Agreement. As held in *Lamb v. Emhart Corp.*, 47 F.3d 551, 558 (2d Cir.1995), "[i]ncorporation by reference produces a single agreement out of incorporated documents and the contract itself."

tionable as fraud."); *In re Klaiman,* 202 B.R. 813, 816 (Bankr.D.Conn.1996) ("To be actionable, the representation must be one of existing fact and not merely an expression of opinion, expectation or declaration of intention.") (*quoting Smith v. Meyers,* 130 B.R. 416, 423 (Bankr.S.D.N.Y.1991)).

Courts have found parties' assessment of their own abilities and successes to be non-actionable statements of opinion when rendered in good faith. In *Sudul v. Computer Outsourcing Servs., Inc.,* 917 F.Supp. 1033, 1044 (S.D.N.Y.1996), the defendant asserted a counterclaim alleging that the plaintiff made false statements regarding his "abilities" and "alleged managerial role" at his prior employer, which fraudulently induced the defendant to enter into an employment agreement with him. The court held that such representations regarding plaintiff's employment history were "nonactionable statements of opinion rather than fact." *Id.*

Similarly, in *Stern v. Satra Corp.,* 539 F.2d 1305, 1308 (2d Cir.1976), the Second Circuit explained:

> Value, quality, fitness, *success,* are usually understood as meaning no more than the objects conform with the declarant's individual yardstick in such matters. While he may make it clear that his reference is to some commonly accepted measure, ordinarily he does not, and his hearer takes it for more at his peril. Utterances such as those now at bar are in this class. What one man would call a *success* another might not; there is no certain objective standard to which reference is impliedly made.

(emphasis added) (*quoting Taylor v. Burr Printing Co.,* 26 F.2d 331, 334 (2d Cir. 1928)) (L.Hand, J.).

██ In the instant case, Chrust believed he successfully worked with small companies in the past, and an objective standard to measure this "success" is lacking. Chrust claims that Greenberg sub-

mitted irrelevant information from years (in one case 12 years) after Chrust worked at the cited companies. Chrust points to the following evidence in support of his success: While Executive Vice President of corporate planning for Vodavi Technology Corp., Chrust engineered the acquisitions of ISOETEC Communications, Inc. and Executone, Inc., expanding the company by four times the size it was when Chrust first arrived; as Chairman and CEO of AMNEX from 1989 through 1991, Chrust assisted the company in raising several million dollars; while an officer and director of Winstar, Chrust assisted in raising of hundreds of millions of dollars for the company and was instrumental in bringing and negotiating an offer by Morgan Stanley & Co., Inc. (Chrust's Mem. at 16.) In order to prevail on a fraud claim, a plaintiff must prove that an alleged misrepresentation was "known to be false by defendant." *Feeley v. Whitman Corp.,* 65 F.Supp.2d 164, 172 (S.D.N.Y.1999). Here, Greenberg does not establish Chrust's bad faith.

In the *American Bank Note* case, cited by Greenberg, unlike in the present case, the defendant made an affirmative factual statement that could constitute the basis for a fraud action. *In re American Bank Note Holographics, Inc. Secs. Litig.,* 93 F.Supp.2d 424 (S.D.N.Y.2000). The defendant represented that a company was more valuable than market valuation of its parent company reflected and that following the IPO, it would be able to continue the profitable growth it had begun. *Id.* at 443. Thus, the defendant went beyond "generalized optimism about the future," but made a statement about the company's value *at the time. Id.* (emphasis in original). The defendant was not discussing his amorphous "success" with a company at some point in the past or future, but rather the value of a company at a specific

time. This statement is thus very different from Chrust's alleged representation.

Additionally, the companies with which Chrust was previously affiliated were publicly traded, and information concerning their current and prior financial conditions was readily available to Greenberg. Greenberg, a sophisticated businessman, cannot claim to have been misled by a representation where information concerning the underlying facts is available. *Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d at 98.

In any case, Chrust's representation of his work with the other companies is immaterial. Greenberg testified that Chrust's relationship with other companies "was all *de minimus* to me" compared to Chrust's relationship with Winstar, and thus "[w]e didn't get into any of the details of what specifically he did with those companies." Having admitted that he did not rely upon this alleged misrepresentation, Greenberg cannot use it as a basis for his fraud claim.

### 2. Chrust's Alleged Representation He Previously Managed a Hedge Fund

 At Greenberg's deposition, it became apparent that it was Chrust's experience and success as a money manager at SGC (achieving 24% rate of return) that Greenberg incorrectly assumed "might imply" he managed a hedge fund. (Pomeranz Aff. ¶ 51.) Thus, the alleged mis-

representation was Greenberg's own assumption.

Furthermore, Greenberg admitted at his deposition that he did not rely on this alleged representation. Greenberg testified about a statement made at a meeting that occurred *after* the SGC Agreement was signed. According to Greenberg, Chrust "may have mentioned it [the hedge fund] before but I wasn't really focused on it before." (Pomeranz Aff. ¶ 48.) Greenberg further made no inquiries into the nature of Chrust's investments or who the investors were. Greenberg testified:

> it was his credentials at Winstar that was ... the foundation or the basis for ... my continuing conversations with him. I mean, the other things he mentioned to me and they seemed impressive, but it was not nearly as important to me as his Winstar relationship.

(Pomeraz Aff., ¶ 48.) [8]

### C. Post–1999 Misconduct and Overall Lack of Credibility by Chrust Cannot Provide the Basis for a Fraud Claim

 Finally, Greenberg points to post–1999 misconduct and overall lack of credibility by Chrust in support of his fraud action. These allegations cannot form the basis of a fraud claim as any post–1999 misconduct by Chrust could not have induced Greenberg to contribute his personal securities to Worlds in connection with Chrust's retention in 1999.

---

**8.** At his deposition, Greenberg testified that what he considered important about the alleged representation concerning Chrust's managing a hedge fund was that it evidenced Chrust's contacts and excellent reputation with potential investors. (Pomeranz Aff. ¶ 49.) Chrust points to other evidence in support of these characteristics in his submissions: At Sanford C. Bernstein & Co., Inc., Chrust was made partner in 1996, served as the firm's Director of Technology Research, and was ranked in the top tier of telecommunications analysts by Individual Investor magazine; Rouhana testified that Chrust's reputation at Sanford C. Bernstein & Co. was excellent and that it ultimately lead Winstar to hire him as a consultant; Chrust's reputation and relationship with Morgan Stanley & Co., Inc. was instrumental in Winstar's ability to obtain its first major debt financing. (Chrust's Mem. at 19.)

### Conclusion

For the reasons set forth, defendant's motion for summary judgment is granted.

Enter judgment on notice.

It is so ordered.